UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KATHERINE L. YOUNG,

             Plaintiff,

vs.                            Case No. 3:06-cv-89-J-33HTS

BANK   OF   AMERICA   CORPORATION
CORPORATE BENEFITS COMMITTEE,

             Defendant.
_____/


**ORDER**

     This matter comes before the Court pursuant to Defendant's Dispositive Motion for Summary Judgment (Doc. # 16), filed by Defendant Bank of America Corporation Corporate Benefits Committee on October 6, 2006.  Plaintiff filed a response on November 3, 2006.  (Doc. # 22.)  For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED**.

**I.   Background**

     Bank of America employees may be eligible to participate in employee benefit plans governed by the Employee Retirement Income Security Act of 1974.  One such plan is the Bank of America Group Benefits Plan.  (Doc. # 16-4, at 5.)  Another plan is the Bank of America Pension Plan.  (Doc. # 18-2, at 8.)  Both plans are administered by Defendant Bank of America Corporation Corporate

1

Benefits Committee.  (Doc. # 16, at 5.)  The plans provide that a participant who is receiving long-term disability benefits will be treated as an active employee for the purpose of accruing credit toward retirement benefits.  This case is about Plaintiff Katherine L. Young's right to retirement benefits under the plans.

The plans provide Defendant with discretion to interpret their provisions and make benefits determinations.  (Doc. # 16, at 12.) The group benefits plan provides, "[Defendant] shall have discretionary authority to determine eligibility for and to construe the terms of the Group Benefits Program."  (Doc. # 16-4, at 10.)  Similarly, the pension plan states, "the [Defendant] shall have the discretion to decide any factual or interpretive issues within the scope of its authority that arise in connection with the operation and administration of the Plan or the Trust (including the determination of Claims) . . . ."  (Doc. # 18-2, at 34.)

Under the plans, an employee is eligible for retiree medical benefits when the employee meets the requirements of the "Rule of 75."  That rule provides that an employee can retire when the sum of the employee's years in service and age is seventy-five or over. (Doc. # 16, at 5.)  The rule has two other requirements as well. The employee must be at least fifty years old, and the employee must have completed fifteen years of service.  (Doc. # 16, at 5.) An employee also builds "compensation credits" under the Pension Plan until that employee's "severance from service date."  (Doc. #

2

15, at 5.)   An employee who is receiving long-term disability benefits under Bank of America's long-term disability plan does not experience a "severance from service date" until the employee turns sixty-five, dies, or "ceases receiving long-term disability benefits under the Bank of America Group Benefits Program." (Doc. # 18-2, at 26.)   Thus, a plan participant receiving long-term disability benefits under the plan continues to accrue "compensation credits" and time in service toward satisfying the "Rule of 75."   In short, a plan participant receiving long-term disability benefits under the plan is treated as an active employee for the purpose of building credit toward retirement.

Plaintiff began working for Bank of America[1] on March 5, 1984. (Doc. # 16, at 2.)   As a result of health problems, Plaintiff left active employment with Bank of America on August 1, 1995, and began receiving long-term disability benefits under the Group Benefits Plan.   (Doc. # 16, at 3.)   Metropolitan Life Insurance Company (MetLife) insures the long-term disability benefits provided by the Group Benefits Plan.   (Doc. # 16, at 3.)   In this capacity, MetLife paid Plaintiff's long-term disability benefits.   (Doc. # 16, at 3.) MetLife stopped these payments on November 30, 2000.   (Doc. # 16, at 3.)   As of that date, Plaintiff did not satisfy the "Rule of 75."   It appears Plaintiff would first have satisfied the "Rule of

---

[1]In fact, Plaintiff began as an employee of Barnett Bank, a predecessor of the entity now known as Bank of America.   (Doc. # 16, at 2.)

75" sometime in 2003 had her long-term disability benefits continued to that time. (See Doc. # 16, at 7 (stating that Plaintiff was fifty-four years old, and had over sixteen years of service as of November 2000); see also Doc. # 16-2, at 30 (stating in e-mail that Plaintiff's retirement eligibility date was in 2003).) Thus, in order to qualify for full retirement benefits, Plaintiff must have been receiving long-term disability benefits under the plan through sometime in 2003.

In 2003, Plaintiff sued MetLife, claiming that MetLife's November 2000 termination of Plaintiff's long-term disability benefits had been wrongful. (Doc. # 16, at 3.) On February 23, 2004, Plaintiff settled her claim against MetLife for $7,500. (Doc. # 16, at 3; Doc. # 16-2, at 38.) The settlement agreement provided that Plaintiff released MetLife, Bank of America, and affiliated companies from all claims. (Doc. # 16-2, at 36.)[2]

---

[2]In full, the release section of the settlement agreement provided,

> Except for the duties, liabilities, agreements and obligations under this Release, Sedlacek-Young irrevocably and unconditionally, completely and forever releases and discharges any and all claims or demands, losses, costs (including attorneys' fees), damages, actions (including the Action), causes of action, whether in law or equity, suits, administrative actions or proceedings, judgments, executions, attachments, debts, contracts, accounts, agreements, promises, liabilities and obligations of every kind and nature whatsoever including, without limitation, any claims or matters arising out of or in any way connected with the facts underlying the Action, the allegations set forth in the Action and the allegations which could have been made in

4

Elsewhere, though, the settlement agreement seemed to contemplate that Plaintiff would make a claim for retirement benefits under the pension plan. The settlement agreement provided that Plaintiff would keep information relating to the settlement confidential. (Doc. # 16-2, at 37.) In the section on confidentiality, the agreement stated, "This provision does not apply to [Plaintiff's] discussions with Bank of America necessary for the application for Pension Benefits." (Doc. # 16-2, at 37.) Thus, Plaintiff argues the agreement envisioned that she would make a claim for benefits from a Bank of America affiliate.

Weeks after executing the settlement agreement, Plaintiff made just such a claim. Her attorney sent a letter to Bank of America

---

the Action, which claims may have existed, exist, and/or may exist as of the date of execution of this Release (hereinafter referred to as the "Released Claims"), whether secured or unsecured, whether now known or unknown, whether suspected or unsuspected and whether or not heretofore asserted which Sedlacek-Young now holds or owns, or at any time heretofore held or owned, or may at any time hold or own, against MetLife, Bank of America and/or the Plan, and each of their partners, subsidiaries, affiliates, parent corporations, agents, employees, officers, directors, shareholders, attorneys, insurers, representatives, heirs, executors, administrators, spouses, principals, predecessors, successors and assigns, and each of them. The Released Claims shall specifically include, without limitation, any and all claims for benefits under the Plan, any claim regarding administration of the Plan under ERISA, and any other claims which could have been made in the Action which arise out of or relate to the claims set forth in the Action.

(Doc. # 16-2, at 36.)

applying for "retiree medical benefits and pension benefits." (Doc. # 16, at 4.)  This letter stated that Plaintiff received long-term disability benefits as a result of the settlement with MetLife.  (Doc. # 16-2, at 17.)  Consequently, the letter argued, Plaintiff received long-term disability benefits long enough to satisfy the "Rule of 75."  (Doc. # 16-2, at 17.)

Defendant disagreed.  On June 3, 2005, Defendant sent a letter to Plaintiff's attorney denying Plaintiff's claim.  (Doc. # 16, at 7.)  The letter stated that the settlement did not result in Plaintiff receiving long-term disability benefits after November 2000.  (Doc. # 16-2, at 49.)  As a result, the letter concluded, Plaintiff did not satisfy the "Rule of 75."  (Doc. # 16-2, at 50.)

Plaintiff appealed this denial using Defendant's appeal procedure.  On August 23, 2005, Plaintiff's attorney sent a letter to the Bank of America Benefits Appeals Committee requesting that the committee overturn the denial of benefits.  (Doc. # 16-2, at 46.)  This letter argued that Plaintiff received long-term disability benefits "up to the date of the settlement agreement which was February 23, 2004."  (Doc. # 16-2, at 46.)  Thus, according to the letter, Plaintiff satisfied the "Rule of 75" and is entitled to receive retirement benefits.  (Doc. # 16-2, at 46-47.)

Again, Defendant disagreed.  On February 1, 2006, the Benefits Appeals Committee sent a letter denying Plaintiff's claim.  (Doc.

# 16-2, at 70.)  This letter stated that Plaintiff did not receive long-term disability benefits under the Bank of America Long-Term Disability Plan after November 30, 2000. (Doc. # 16-2, at 70.)  As such, Plaintiff was entitled to neither service credit toward satisfying the "Rule of 75," nor compensation credits after November 30, 2000.  (Doc. # 16-2, at 70.)  The letter quoted the Associate Handbook of Bank of America, "While you are receiving [long-term disability] benefits, you receive compensation credits as if you were actively employed . . . and continue to earn benefit service until . . . [y]ou are no longer receiving benefits under the long-term disability plan . . . ."  (Doc. # 16-2, at 70–71.)  The letter then stated,

> [Plaintiff] properly received compensation credits and benefit service until November 30, 2000, the date she ceased "receiving [long-term disability] benefits" under the [long-term disability] plan.  There is no provision in the Plan for crediting compensation credits or benefit service in connection with a settlement of claims regarding benefits under the [long-term disability] Plan. In addition, there is no provision in the Settlement Agreement to suggest that the amount paid under the Settlement Agreement represents "[long-term disability] benefits."

(Doc. # 16-2, at 71.)  As a result, the letter reported, Defendant had determined that the settlement did not represent payment of long-term disability benefits.  (Doc. # 16-2, at 71.)  Thus, Defendant denied Plaintiff's claim on the basis that her receipt of the $7,500 settlement did not constitute "[receipt of] benefits under the long-term disability plan," as required by the Associate

Handbook.  Plaintiff responded by filing the present lawsuit.[3]

On October 6, 2006, Defendant filed a motion for summary judgment. (Doc. # 16.) Defendant's motion makes three arguments. First, Defendant's motion argues that the benefits denials were correct. (Doc. # 16, at 9.) Second, Defendant submits that the denials are entitled to be upheld under a deferential standard of review, even if they were incorrect. (Doc. # 16, at 9–10.) Third, Defendant contends that Plaintiff released Bank of America from all liability in her settlement agreement. (Doc. # 16, at 10.)

Plaintiff filed a response on November 3, 2006. (Doc. # 22.) In her response, Plaintiff contends that the denial of benefits resulted from an erroneous interpretation of the plan language. (Doc. # 22, at 6–11.) According to Plaintiff, this erroneous interpretation was unreasonable. (Doc. # 22, at 2.) Next, Plaintiff argues that the decision to deny benefits was made by an individual not authorized to make such decisions. (Doc. # 22, at 2.) Consequently, Plaintiff argues, the court must apply a heightened level of scrutiny to the decision. (Doc. # 22, at 2.) Finally, Plaintiff counters Defendant's argument that the settlement agreement released Defendant from any obligation to

---

[3]In fact, Plaintiff initially filed this lawsuit on January 30, 2006, (Doc. # 1), before Defendant denied her appeal. Plaintiff filed an amended complaint on March 8, 2006, reflecting the fact that Defendant denied her appeal. (Doc. # 6.) The parties do not make any arguments concerning the fact that Plaintiff's complaint was initially filed before Defendant denied her appeal. The Court does not consider this issue.

provide retirement benefits.  (Doc. # 22, at 2.)

## II.  Standard of Review

### A.   Summary Judgment in the ERISA Context

Summary judgment does not serve its traditional role in an ERISA case subject to deferential review.  Instead, a motion for summary judgment performs the function of an appellate brief, bringing the legal questions before the district court.  Where an ERISA plan grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the case proceeds as an appeal of the administrator's decision, and that decision is given deference.  See Tippitt v. Reliance Std. Life Ins. Co., 457 F.3d 1227, 1232 (11th Cir. 2006). "In an ERISA benefit denial case [subject to deferential review], . . . in a very real sense, the district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Crume v. Metropolitan Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006) (alterations in original) (quoting Curran v. Kemper Nat. Servs., Inc., 133 Fed. Appx. 740, 2005 WL 894840, at *7 (11th Cir. 2005) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002))).  In such cases, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of

summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Id., at 1272 (quoting Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999)).

**B.   The ERISA Standard of Review**

The Eleventh Circuit has articulated a clear, step-by-step procedure for reviewing the denial of benefits under an ERISA plan. See Tippitt, 457 F.3d at 1231-32.   In ERISA cases, the district court must conduct the following analysis:

> In step one, a court must determine which standard to apply in reviewing the claims administrator's benefits decision. ERISA itself does not provide the appropriate standard. A court chooses the appropriate standard after examining the plan documents to determine whether they grant the administrator discretion to interpret disputed terms. If the court finds that the documents do not grant the administrator discretion, it applies de novo review to the administrator's benefits determination and does not proceed to the remaining steps. If the court finds that the documents grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review and possibly heightened arbitrary and capricious review and proceeds to the second step.
>
> In step two, regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews de novo the claims administrator's interpretation of the plan to determine whether it is "wrong." "Wrong" is the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms de novo, the court disagrees with the claims administrator's plan interpretation. If the court determines that the administrator's interpretation is right, the inquiry ends, but if it determines that the interpretation is wrong, the court proceeds to step three.
>
> In step three, the court decides whether the claimant has proposed a reasonable interpretation of the plan. If the

10

court concludes that he has, it continues on to step four. In step four, the court must determine whether the claims administrator's wrong interpretation is nonetheless reasonable. If it is reasonable, then the interpretation is entitled to deference even though the claimant's interpretation is also reasonable, and the court moves to step five.

Finally, in step five, the court must consider the self-interest of the administrator. If no conflict of interest exists, then only arbitrary and capricious review applies and the claims administrator's wrong but reasonable decision will not be found arbitrary and capricious. The inquiry ends at that point. If a conflict does exist, then heightened arbitrary and capricious review applies. The burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest. The claims administrator must show that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries. Even if the administrator satisfies this burden, the insured may still be entitled to benefits if he can show by other measures that the administrator's decision was arbitrary and capricious.

Tippitt v. Reliance Std. Life Ins. Co., 457 F.3d 1227, 1232 (11th

Cir. 2006) (internal quotations and citations omitted).

**III. Analysis**

    **A.   Step One: De Novo or Deferential Review**

As instructed, the Court begins its analysis by "examining the

plan documents to determine whether they grant the administrator

discretion to interpret disputed terms." Tippitt, 457 F.3d at

1232. If the plans explicitly grant such discretion, a deferential

standard of review is employed. HCA Health Servs. of Ga., Inc. v.

Employers Health Ins. Co., 240 F.3d 982, 992 (11th Cir. 2001). It

is abundantly clear that the two plans at issue explicitly grant

discretion.     The   group   benefits   plan   grants   Defendant
"discretionary  authority  to  determine  eligibility  for  and  to
construe the terms of the Group Benefits Program." (Doc. # 16-4,
at 10.)  Likewise, the pension plan provides Defendant with "the
discretion to decide any factual or interpretive issues within the
scope of its authority that arise in connection with the  operation
and  administration  of  the  Plan  or  the  Trust  (including  the
determination of Claims) . . . ." (Doc. # 18-2, at 34.)  As a
result, the Court reviews Defendant's decision to deny Plaintiff
retirement  benefits  under  a  deferential  standard  --  either
arbitrary and capricious or heightened arbitrary and capricious.

Plaintiff argues that a more searching standard of review is
required  because  there  was  a  procedural  irregularity  in  the
administrative appeal. (Doc. # 22, at 3.) Specifically, Plaintiff
argues that the decision-maker who actually decided the appeal on
Defendant's behalf exceeded her authority.  (Doc. # 22, at 4.)
Plaintiff cites three cases for the proposition that a procedural
irregularity can require a heightened standard of review.  These
cases all hold that a "serious procedural irregularity" can call
for a heightened standard of review only where the procedural
irregularity "caused  a  serious  breach  of  the  administrator's
fiduciary duty." Barnhart v. UNUM Life Ins. Co., 179 F.3d 583, 588
(8th Cir. 1999) ("The second prong requires demonstrating how
a . . . serious procedural irregularity caused a serious breach of

the administrator's fiduciary duty."); <u>see also</u> <u>Woo v. Deluxe</u>
<u>Corp.</u>, 144 F.3d 1157, 1160 (8th Cir. 1998) ("To obtain a less
deferential review, [a plan beneficiary] must present material,
probative evidence demonstrating that (1) . . . a serious
procedural irregularity existed, which (2) caused a serious breach
of the plan administrator's fiduciary duty . . . ."); <u>Buttram v.</u>
<u>Central States</u>, 76 F.3d 896, 900 (8th Cir. 1996) ("For this
heightened review to apply, the beneficiary must show (1) that a
serious procedural irregularity existed, which (2) caused a serious
breach of the plan trustee's fiduciary duty to the plan
beneficiary."). Plaintiff has not alleged that any procedural
irregularity in this case caused a serious breach of the
administrator's fiduciary duty. Instead, Plaintiff has only
alleged that an employee of Defendant acted outside the scope of
authority granted by Defendant. There is no showing that this is
a "serious procedural irregularity" or that it "caused a serious
breach of fiduciary duty." <u>Woo</u>, 144 F.3d at 1160. For that
reason, the Court will not apply a more searching standard.

**B.   Step Two: Whether Defendant's Decision Was Wrong**

At the second step, the Court reviews Defendant's decision de
novo to determine whether the decision was right or wrong.
<u>Tippitt</u>, 457 F.3d at 1232. If the decision was right, the inquiry
ends. <u>Id.</u>

In this case, the essential question is whether the plans

required that Plaintiff be treated as a Bank of America employee from November 30, 2000, to February 23, 2004.   If the plans required that she be treated as an employee for that period, she would have satisfied the "Rule of 75" and would have accrued compensation credits.   Defendant determined that the plans did not require that treatment of Plaintiff.

In its letter denying Plaintiff's claim, Defendant relied upon language from the Bank of America Associate Handbook: "While you are receiving [long-term disability] benefits, you receive compensation credits as if you were actively employed . . . and continue to earn benefit service until . . . [y]ou are no longer receiving benefits under the long-term disability plan . . . ."[4] (Doc. # 16-2, at 70-71.)   Defendant interpreted this language as meaning that a plan participant must be receiving long-term disability benefits under the plan to be entitled to treatment as an employee.   (See Doc. # 16-2, at 71 ("[Plaintiff] properly received compensation credits and benefit service until November

---

[4]In addition, the pension plan itself states,

a Participant who terminates employment as a Full- or Part-Time Employee due to Disability shall not experience a Severance from Service Date and shall continue to be credited with Service and Months of Service until the earliest of the date the Participant (i) attains age sixty-five (65), (ii) ceases receiving long-term disability benefits under the Bank of America Group Benefits Program or (iii) dies.

(Doc. # 18-2, at 26.)

14

30, 2000, the date she ceased 'receiving [long-term disability] benefits' under the [long-term disability] Plan.").) Defendant reasoned that Plaintiff's receipt of payment under the settlement was not receipt under the plan. (See Doc. # 16-2, at 71 ("There is no provision in the Plan for crediting compensation credits or benefit service in connection with a settlement of claims regarding benefits under the . . . Plan.").) Defendant also reasoned that the settlement did not constitute long-term disability benefits. (See Doc. # 16-2, at 71 ("In addition, there is no provision in the Settlement Agreement to suggest that the amount paid under the Settlement Agreement represents '[long-term disability] benefits.'").)

In sum, Defendant concluded that the plans required two conditions to be met for a participant to be entitled to treatment as an employee in these circumstances. First, the participant had to be receiving benefits under the long-term disability plan. Second, what the participant was receiving had to be "long-term disability benefits." Defendant determined that Plaintiff met neither of these conditions. Defendant determined that the settlement was not received under the long-term disability plan, and Defendant determined that the settlement did not constitute "long-term disability benefits."

Plaintiff counters each of these two bases for Defendant's decision. First, Plaintiff argues that the pension plan requires

merely that a plan participant receive long-term disability benefits, not that a plan participant receive such benefits under the long-term disability plan. (Doc. # 22, at 6-7.) Plaintiff asserts the language "'under the [long-term disability] Plan,'" on which the denial letter relied, "is not part of the express requirements of the Pension Plan." (Doc. # 22, at 6 (quoting Doc. # 16-2, at 71).) Second, Plaintiff argues that the settlement constituted payment of long-term disability benefits. Plaintiff states, "In reviewing the Release as a whole, it is clear that the amount paid by MetLife should be characterized as settlement of Plaintiff's claims for [long-term disability] benefits . . . ." (Doc. # 22, at 7.) Plaintiff specifically identifies the settlement agreement's recitation that she "commenced the Action, alleging . . . that her benefits were wrongfully terminated and seeking payment of benefits from the date of termination (November 30, 2000) through the present (February 23, 2004)." In addition, Plaintiff argues that the language of the plans is ambiguous and must be interpreted against Defendant. (Doc. # 22, at 8-11.)

Plaintiff is simply mistaken in her assertion that the plan's language does not include any requirement that benefits be received under the long-term disability plan. This requirement is expressly included in the plan's language.[5] The summary plan description

---

[5]As quoted above, the summary plan description states, "While you are receiving [long-term disability] benefits, you receive compensation credits as if you were actively employed . . . and

makes clear that a plan participant will be treated as an employee until the participant is "no longer receiving benefits <u>under the long-term disability plan</u> . . . ." (Doc. # 16-2, at 70-71.) By its plain terms, the plan requires that a participant both receive long-term disability benefits, and receive those benefits under the long-term disability plan.

Nevertheless, if the plan is ambiguous, it must be interpreted against Defendant. <u>See</u> <u>Lee v. Blue Cross/Blue Shield</u>, 10 F.3d 1547, 1551 (11th Cir. 1994) ("[W]e hold that application of the rule of contra proferentem is appropriate in resolving ambiguities in insurance contracts regulated by ERISA."); <u>see also</u> <u>Tippitt v. Reliance Std. Life Ins. Co.</u>, 457 F.3d 1227, 1235 (11th Cir. 2006). Thus, if the requirement that benefits be received <u>under the long-term disability plan</u> is ambiguous, the Court will accept the interpretation that favors Plaintiff. But this provision is not ambiguous. Plaintiff has not argued that this provision can be interpreted as encompassing payments made in settlement of a claim for long-term disability benefits. Instead, Plaintiff's ambiguity argument appears to focus entirely on the first element of the

───────────────

continue to earn benefit service until the earlier of the following: . . . You are no longer receiving benefits <u>under the long-term disability plan</u> . . . ." (Doc. # 16-2, at 70-71 (emphasis added).) The pension plan states that a participant "shall continue to be credited with Service and Months of Service until the earliest of the date the Participant (i) attains age sixty-five (65), (ii) ceases receiving long-term disability benefits <u>under the Bank of America Group Benefits Program</u>." (Doc. # 18-2, at 26 (emphasis added).)

test: the definition of long-term disability benefits.  (See Doc. # 22, at 8-11.)  The language of the plan requires a participant to receive benefits <u>under the long-term disability plan</u>.[6]  This provision is not ambiguous, and its plain meaning is that the benefits must be paid in accordance with the terms of the long-term disability plan.  In this case, Plaintiff received payment under a settlement agreement, not <u>under the long-term disability plan</u>.[7]

The plan treats a non-working participant as an employee if the participant meets two requirements: (1) the participant is receiving long-term disability benefits (2) under the long-term disability plan.  It is clear that a participant must meet both of these requirements to be entitled to treatment as an employee. Defendant determined that Plaintiff met neither of these requirements, and therefore found Plaintiff ineligible for treatment as an employee.  The Court finds that plaintiff failed to

---

[6]Indeed, Plaintiff distinguishes two cases cited by Defendant on the basis that the plan language in those cases required that benefits be received <u>under the plan</u>.  (Doc. # 22, at 12.) Plaintiff calls this distinction "critical."  (Doc. # 22, at 12.)

[7]The Court does not hold that payments under a settlement agreement can never be payments "under a long-term disability plan."  The Court merely finds that, in this case, the settlement did not constitute the receipt of benefits under the long-term disability plan.  The settlement was for an amount significantly less than the value of long-term disability benefits from December 2000 to February 2004 (see Doc. # 16, at 17 (stating that Plaintiff demanded long-term disability payments from December 2000 to September 2003, which would have amounted to $14,000, and that Plaintiff received only $7,500 in settlement)), and the settlement agreement specifically stated that MetLife admitted no liability (Doc. # 16-2, at 37).

meet the second requirement.  Consequently, the Court determines that Defendant's decision to deny Plaintiff benefits was correct.

Defendant correctly interpreted the plan as requiring that Plaintiff receive long-term disability benefits under the long-term disability plan.  Where a court determines that the administrative interpretation of the plan is correct, "the inquiry ends." Tippitt, 457 F.3d at 1232.  Thus, the Court ends its inquiry and upholds Defendant's decision to deny Plaintiff benefits.  As a result, the Court need not reach Defendant's remaining arguments.

## IV.  Conclusion

For the foregoing reasons Defendant's decision to deny Plaintiff the benefits she claimed must be upheld.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

1.  Defendant's Dispositive Motion for Summary Judgment (Doc. # 16) is **GRANTED**.

2.  The Clerk shall enter a final judgment in this case providing that Plaintiff Katherine L. Young shall take nothing on her claims against Defendant Bank of America Corporation Corporate Benefits Committee.

3.  The Clerk shall terminate any pending motions or deadlines and close this case.

19

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 29th day of January 2007.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record